UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL WAKEFIELD,

                    Plaintiff,

        v.                                        Case No. 17-cv-966-pp

TED SERRANO, TINA AMIN,
RYAN MCCLAIN, MICHAEL GIERNOTH,
and STEVEN JOHNSON,

                    Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 23), DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 18), DENYING PLAINTIFF'S MOTION TO AMEND
AND GRANTING PLAINTIFF'S MOTION FOR EXTENSION OF TIME
(DKT. NO. 49) AND DISMISSING CASE**

The court allowed the plaintiff to proceed on a Fourteenth Amendment
due process claim that defendant Serrano fabricated allegations in a conduct
report and used his position to influence the outcome of the hearing, that
defendant McClain didn't ensure that video was available at the disciplinary
hearing (and that the plaintiff wasn't able to present video footage, even though
he'd asked for it), that defendant Amin found him guilty despite not having
seen the video footage, and that he was prevented from presenting evidence
that Amin was not impartial. Dkt. No. 10 at 8. The court also allowed the
plaintiff to proceed on a due process claim that defendant Johnson knew about
the above violations but turned a blind eye. Id. at 9. Finally, the court allowed
the plaintiff to proceed on an Eighth Amendment conditions-of-confinement

1

claim against Giernoth and Johnson, based on his being double-bunked and subject to an ant infestation while in segregation. Id. at 10. The plaintiff has moved for summary judgment, dkt. no. 18, as have the defendants, dkt. no. 23. After the motions for summary judgment were filed, the plaintiff moved to amend the complaint and for a brief extension of time to file his response to the defendants' summary judgment arguments. Dkt. No. 49. The court will grant plaintiff's motion for an extension of time *nunc pro tunc*, but will deny his motion to amend the complaint. The court will grant the defendants' motion for summary judgment, deny the plaintiff's motion for summary judgment and dismiss the case.

## I.    FACTS

According to defendant Lieutenant Serrano, on February 3, 2017 he learned of an anonymous tip regarding an incident that had occurred in the prison laundry room two days earlier. Dkt. No. 28-1 at 14. The handwritten tip indicated that "Daniel Wakefield beat up that boy in westside laundry room." Dkt. No. 27-1 at 15. After reviewing the security footage taken of the area between 3:00 and 3:30 p.m. that day, Serrano concluded that an inmate named Anderson was the victim of a closed-fist punch from behind at the hand of the plaintiff. Id. Serrano reported that the video showed the plaintiff continuing to "pummel" Anderson while Anderson was in a defenseless position on the floor. Dkt. No. 28-1 at 15. Another officer later confronted the plaintiff, who denied being in a fight and told an Officer Delagarra that he injured his

2

knuckles playing basketball. Id. Serrano's conduct report indicated that the plaintiff subsequently changed his story, stating in an interview two days later that his hand injuries were the result of punching "some walls" while angry. Id. Serrano also ascertained that the plaintiff had checked out of the visitation area at 3:15 p.m. on February 1, "leaving 15 minutes to return to the unit." Id. Serrano concluded that given the visitation area's close proximity to the laundry room, the plaintiff would have had time to commit the assault before returning to his cell. Dkt. No. 25 at ¶12. Based on the video, the visitation area's proximity to the laundry room, the injuries to the plaintiff's hand and the plaintiff's changing story, Serrano wrote in his conduct report that it was "more likely than not" that the incident happened as the anonymous tipster had reported. Dkt. No. 28-1 at 15.

The plaintiff asserted in his proposed findings of fact that Serrano lied about seeing the plaintiff beat up another inmate "on camera." Dkt. No. 20 at ¶4. He provided a copy of a repair work order from a Sgt. Rognsvoog, reporting that "[t]he camera for the West Side Laundry room isn't working." Dkt. No. 20-1 at 19. In the "DATE OF REPORT/REQUEST" box, someone had crossed through the typed "10/15/2018" and handwritten "2-2-17"—the day after the incident. Id. The maintenance notes say that the repair was completed the same day, "replaced with used camera from BTM." Id. The "DATE COMPLETED" box reads "02/02/2017." Id. The plaintiff also provided affidavits from two inmates. Inmate Raymond Franz attested that on February 3 (two

3

knuckles playing basketball. Id. Serrano's conduct report indicated that the plaintiff subsequently changed his story, stating in an interview two days later that his hand injuries were the result of punching "some walls" while angry. Id. Serrano also ascertained that the plaintiff had checked out of the visitation area at 3:15 p.m. on February 1, "leaving 15 minutes to return to the unit." Id. Serrano concluded that given the visitation area's close proximity to the laundry room, the plaintiff would have had time to commit the assault before returning to his cell. Dkt. No. 25 at ¶12. Based on the video, the visitation area's proximity to the laundry room, the injuries to the plaintiff's hand and the plaintiff's changing story, Serrano wrote in his conduct report that it was "more likely than not" that the incident happened as the anonymous tipster had reported. Dkt. No. 28-1 at 15.

The plaintiff asserted in his proposed findings of fact that Serrano lied about seeing the plaintiff beat up another inmate "on camera." Dkt. No. 20 at ¶4. He provided a copy of a repair work order from a Sgt. Rognsvoog, reporting that "[t]he camera for the West Side Laundry room isn't working." Dkt. No. 20-1 at 19. In the "DATE OF REPORT/REQUEST" box, someone had crossed through the typed "10/15/2018" and handwritten "2-2-17"—the day after the incident. Id. The maintenance notes say that the repair was completed the same day, "replaced with used camera from BTM." Id. The "DATE COMPLETED" box reads "02/02/2017." Id. The plaintiff also provided affidavits from two inmates. Inmate Raymond Franz attested that on February 3 (two

3

days after the incident), he witnessed a maintenance person work on the camera, only to discover that there was no camera inside the camera housing, "only wires." Dkt. No. 20-1 at 20-21. Franz averred that when he asked what was wrong with the camera, the maintenance person stated that there had not been a working camera in the laundry room since October 2016. Id. at 20. Inmate Matthew Seger declared that "the first week of February 2017," he saw "multiple maintenance persons" working on or replacing the camera in the laundry area. Id. at 22. He stated that the "camera in question had been out of order for some time." Dkt. No. 20-1 at 22.

Serrano wrote his conduct report on February 3. Dkt. No. 28-1 at 14-15. Capt. Thomas Wiegand delivered a copy of the report to the plaintiff on February 8, and a hearing was set for February 16. Id. at 14. The plaintiff appeared at the hearing on February 16; the hearing officer was defendant Tina Amin. Dkt. No. 28-1 at 21. Defendant McClain was the "staff advocate" for the plaintiff at the hearing. Dkt. No. 29 at ¶5. It was McClain's "duty to ensure that Corrections policies and procedures are followed. Additionally, the advocate explains hearing procedures to the accused inmate understands the charge or charges, provides resources to the inmate such as witness statements, gathers evidences, and prepares statements." Id. at ¶6. McClain confirmed that the plaintiff had asked for video of the incident, but said that by the time he became aware that the plaintiff had requested it, "the video was no longer available." Id. at ¶7. According to Serrano, after he interviewed the plaintiff, he

4

tried to retrieve the video footage and save it. Dkt. No. 27 at ¶18. He says, however, that "the video was unavailable to be recalled from the system," and that "the version of the DVR camera system in place at Racine had many issues that would cause video footage to be deleted." Id.

The plaintiff made a statement at the disciplinary hearing. Dkt. No. 28-1 at 21. The summary of that statement indicates that the plaintiff said that the conduct ticket was a "lie" and that "none of that shit ever happened." Id. He said that before he left for his visit, he had someone put something in the dryer; he said that when he returned after his visit, someone "ran up" on the plaintiff and said he stole that person's laundry bag. Id. The plaintiff responded that he did not know, the person spit on the plaintiff, so the two fought. Id. The plaintiff appears to have conceded that he punched the person when they were wrestling, but said it was because the person spit on him. Id.

The plaintiff also called a witness at the hearing, inmate Marcus McClain (not the defendant of the same name). Id. at 22. The written summary of the witness's testimony indicates as follows:

> What what was I doing in the laundry room—getting laundry. Did anyone approach him in the laundry. I didn't know that guy he was mad about a bag. Was he aggressive toward [illegible]. No he wasn't [illegible] the other person was the aggressor. What did you see: the other guy wouldn't let [the plaintiff] leave. Then I got out of there. The other guy wouldn't stop.

Id. at 22.

Amin found the plaintiff not guilty of the charge of aggravated assault but concluded that he was guilty of the lesser charge of assault. Id. at 21. She explained in her proposed findings of fact that "[b]ased on [the plaintiff's] admission to being involved in the altercation, his injuries, the conduct report, and the testimony of [the plaintiff's] witness," she decided that the plaintiff was "more likely than not guilty of assaulting another inmate and causing him injury." Dkt. No. 30 at ¶10. She couldn't remember whether she reviewed video at the hearing or not, but stated that if she didn't, it was because video "was not available." Id. at ¶11. Although Amin concluded that it was more likely than not that the plaintiff had assaulted another inmate, "due to the testimony that the other inmate was the aggressor," she found the plaintiff "guilty of the lesser charge of assault, instead of the charged offense of aggravated assault." Id. at ¶12. In the "REASON FOR DECISION" section of the hearing form, Amin wrote, "risk of disruption" indicated that the lesser included offense of assault was "more fitting as assault for how conduct report states" (sic). Id. Amin ordered a disposition of 120 days of segregated confinement. Id.

The plaintiff appealed the same day, arguing that the conduct ticket was a "complete lie" and that it was "manufactured . . . because staff couldent [sic] prove a altercation accured [sic]." Dkt. No. 28-1 at 23. He asserted that there was no video evidence to "debunk tickets version of magical video footage." Id. He characterized his punishment as extreme and excessive, arguing that other

6

people had received lesser sanctions for fights. Id. He asserted that the other individual involved in the fight had received a lesser sentence. Id.

The record also contains an undated letter from the plaintiff to the warden. Dkt. No. 27-1 at 11. In the letter the plaintiff stated that the altercation had been his "first fight in the 6 years [he had] been incarcerated and [he] wasn't even the aggressor." Id. He asserted that the "true aggressor" received only fifteen days, compared to his 120-day sentence. Id. He told the warden that he was never asked his side of things during the "half ass investigation," and that also protested that "they" automatically "assumed [he] was in the wrong and the aggressor because they couldn't prove the fight and [he] came out the victor of the altercation/fight." Id. He also asserted that although he'd asked for the "alleged bogus[]" video footage, he was told there was none, and asked how he could have been convicted without footage. Id.

On March 7, defendant Steven Johnson, the deputy warden, reviewed the appeal and affirmed the hearing officer's decision. Id. at 10.

On March 9, the plaintiff was transferred to segregation in Cell 2205 in the Waukesha East unit of the prison. Dkt. No. 25 at ¶54. The cell was designed to house two inmates. Id. at ¶62. The plaintiff was given a "boat" in which to sleep. Id. The prison used these "boats" in cells where there was only one bed mounted to the wall; the second inmate receives mattresses and the plastic boat to get the mattresses off the floor. Id. at ¶58-60. However, when the complaint examiner interviewed defendant Giernoth, the supervisor of the

7

segregation unit, Giernoth said that the plaintiff "could have requested a 'boat' to further elevate his mattress." Dkt. No. 20-1 at 29. This comment implies that the second inmate in a one-bed cell might not receive a "boat" unless he asked for one. The plaintiff declares that he was never provided with a boat and that he stayed on the floor between March 10 and March 17, 2018. Dkt. No. 51 at ¶28. The plaintiff further alleges (and wrote an inmate complaint stating) that during his week-long stretch in that unit, he endured numerous ant bites all over his body due to an ant infestation on the floor of his cell. Id.; Dkt. No. 28-2 at 11. He asserts that he wrote defendants Johnson and Giernoth about the problem but that he did not receive a response. Dkt. No. 51 at ¶30. Neither Giernoth nor Johnson has any recollection of being contacted by the plaintiff. Dkt. No. 25 at ¶¶ 64, 74.

The plaintiff's cellmate at the time, Atoary Harrington, signed an affidavit indicating that there was a "major ant problem" and that the plaintiff complained and asked to be moved every day. Dkt. No. 20-1 at 31. Harrington stated that he could see ant bites on the plaintiff's side, back, shoulder and right arm. Id. Harrington said that the plaintiff claimed the ants were "recruited" by Lt. Serrano, but he attributed this belief to the plaintiff having some kind of "nervous breakdown." Id. Another inmate, DeBradre Jackson, signed an affidavit stating that he'd been in the Waukesha East unit a few times, that he had been forced to sleep on the floor each time, and that each

time he "was subjected to ants and other bugs" crawling on him. Id. at 33-34. Inmate Raymond Franz provided a similar affidavit. Id. at 36.

The plaintiff provided work orders from February 2012 (reporting a silverfish infestation), April 2012 (requesting spraying for ants), July 2012 (requesting spraying for ants), February 2014 (reporting silverfish), December 2014 (requesting the floor be caulked due to ants) and April 2015 (requesting spraying for ants). Dkt. No. 20-1 at 38-40.

The plaintiff says that on March 17, 2017, a nurse named Amy tended to his injuries; he asserts that she was visibly shaken by his ant bites and went to speak with defendant Giernoth. Dkt. No. 51 at ¶31. Medical notes from that visit indicate that the plaintiff had bug bite marks on his arms and shoulders, and there was evidence of scratching. Dkt. No. 28-2 at 16. He was given Benadryl and educated on how to treat the bites, and Benadryl and a steroid cream were sent to the unit. Id. Fifteen minutes later, the notes indicate that the united was call and asked to switch the plaintiff to another cell; the unit agreed to do so. Id.

The plaintiff filled out an information/interview request indicating that he had been attacked by ants while he was "in the hole," and asking to have pictures taken of his injuries and to receive proper medical attention. Dkt. No. 28-2 at 13. While he did not date the request, the person who received it listed the date of receipt as March 22, 2017; that person wrote, "Ants don't attack people. If you have medical conditions write HSU [Health Services Unit]." Id.

9

And on March 25, he filled out an inmate complaint form alleging that he was "bittin continuously the first 5 days then I was attacked by at least 50 to 100 ants at once the final day." Id. at 11. He asked to go to an outside hospital to be properly checked out. Id. at 12. The complaint examiner's office received the complaint on March 28, 2017. Id. at 11. The complaint examiner spoke to Giernoth, who said neither the plaintiff nor any other inmates made him aware of an ant problem. Id. at 2. The examiner noted that the plaintiff had a mattress, could have asked for a "boat" and had access to cleaning supplies for his cell; the examiner also noted that the plaintiff had been seen at the HSU and given Benadryl and "an ointment." Id. The complaint examiner concluded that

> [t]he complainant's claim of ants on the unit does not appear to be a result of staff negligence. Inmate's [sic] are responsible for keeping their rooms in sanitary condition. If the complainant's cell had an issue with ants, he was responsible for addressing it through the RHU Supervisor and he did not. It is noted that the complainant contacted HSU in regards to his ant bites, and they provided treatment. The complainant was then moved to another cell and off the unit.

Id. The defendants indicate that Giernoth didn't take any action on the plaintiff's information request "because [the plaintiff] had already been transferred to another unit." Dkt. No. 25 at ¶67.

The day of his release from segregation, the plaintiff filed an inmate complaint regarding the discipline that he'd received for the fight in the laundry room, alleging again that Serrano had lied and manufactured evidence. Dkt. No. 28-1 at 12. At the initial review stage, the examiner dismissed the

10

complaint because the plaintiff hadn't identified any procedural errors in his disciplinary process. Dkt. No. 28-1 at 2. At a later stage of review, the Corrections Complaint Examiner noted that the reasons for the disciplinary decision appeared "vague" but concluded that it didn't amount to a procedural error or prejudice the plaintiff's ability to defend himself. Id. at 10. The CCE also found that the plaintiff had not alleged in the original complaint that he was denied the ability to present or review evidence, so that issue wasn't before the CCE. Id. At the final stage of review, the Office of the Secretary directed that the conduct report be returned to the complaint examiner to complete the reasons for the decision; that decision was dated June 1, 2017. Id.

Based on the directive from the Office of the Secretary, Racine Correctional Capt. Thomas Wiegand contacted Amin to ask her why she reached the decision she reached in the plaintiff's disciplinary hearing. Dkt. No. 56 at ¶11. He wrote her response on the original conduct report Amin had filled out back in February. Id. Wiegand also states that he instructed her to be more specific in the future. Id. at ¶12. Wiegand wrote two sentences on the plaintiff's original conduct report: "Based on video evidence, and injuries consistent with fighting, inmate is more likely than not guilty of assault. He could not give the same reasons for his injuries." Dkt. No. 27-1 at 9. In his motion to amend the complaint, the plaintiff alleges that these sentences were forged. Dkt. No. 49 at ¶1. Wiegand attests that they were not. Dkt. No. 56 at ¶13.

## II. MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 18, 23)

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or

12

declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Procedural Due Process

The plaintiff has alleged that Serrano, McClain and Amin violated his Fourteenth Amendment right to due process in conducting the disciplinary hearing over the fight in the laundry room, and that Johnson knew about this but did nothing.

"A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." Scruggs v. Jordan, 485 F.3d 934, 939 (7th Cir. 2007). The Seventh Circuit has held that "an inmate's liberty interest in avoiding segregation is limited." Hardaway v. Meyerhoff, 734 F.3d 740, 743 (7th Cir. 2013) (citing Marion v. Columbia Corr. Inst., 559 F.3d 693, 697 (7th Cir. 2009)). To determine whether placement in segregation "amounts to a constitutional violation," courts look at "the combined import of the duration of the segregative confinement and the conditions endured." Id. The defendants appear to assume that the plaintiff had a protected liberty interest in avoiding the 120-day segregated confinement. They argue instead that (1) they did not violate his due process rights, and (2) even if they had, any violation was harmless error.

13

1.    *Due Process*

Due process requires that prisoners in disciplinary proceedings be given "(1) advance (at least 24 hours before hearing) written notice of the claimed violation; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action." Scruggs, 485 F.3d at 939 (quoting Rasheed–Bey v. Duckworth, 969 F.2d 357, 361 (7th Cir. 1992)). The plaintiff argues that the evidence the defendants relied on was fabricated and that Serrano's report was a lie.

The standard for reviewing prison disciplinary hearings is very limited: due process requires only that there be "some evidence" supporting the disciplinary decision. Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455–56 (1985). "Under Hill, the courts are barred from assessing the relative weight of the evidence." Viens v. Daniels, 871 F.2d 1328, 1335 (7th Cir. 1989). The Seventh Circuit has described this as a "lenient standard," meaning that courts "will not reweigh the evidence supporting the board's decision so long as it is not patently unreliable." Webb v. Anderson, 224 F.3d 649, 652 (7th Cir. 2000).

a.    Serrano

In arguing that Serrano lied, the plaintiff is asking this court to reweigh the evidence. He is asking the court to set aside, or ignore, all the information in Serrano's conduct report—the description of the anonymous tip, what

14

Serrano saw on the video footage, the plaintiff's conflicting stories about the injuries on his hands and the timing of his leaving the visitation area, and accept instead the plaintiff's version of events (that he hit the other inmate because that inmate spit on him, that there was no video because the video camera in that area was broken).[1] The Supreme Court and the Seventh Circuit have said that courts may not reweigh the evidence unless it is "patently unreliable." This court is limited to determining whether there was "some evidence" to support the hearing officer's conclusion, and the court concludes that there is.

First, the investigation was initiated by an anonymous written tip that "Daniel Wakefield beat up that boy in westside laundry room." Dkt. No. 27-1 at 15. The anonymous tip is "some evidence" that the plaintiff was involved in an assault, and there is no evidence to indicate that Serrano had reason to falsify

---

[1] In their proposed findings of fact, the defendants state that at the disciplinary hearing, Amin heard testimony by Serrano and reviewed his conduct report. Dkt. No. 25 at ¶36. Amin said as much in her declaration in support of the summary judgment motion. Dkt. No. 30 at ¶7. The plaintiff disputes this, asserting that Serrano wasn't one of the witnesses who testified at the disciplinary hearing. Dkt. No. 53 at ¶36. The report of the disciplinary hearing supports the plaintiff's assertions. That report indicates that the plaintiff provided a statement, and that there was one witness—inmate Marcus McClain. Dkt. No. 28-1 at 21-22. It does not mention Serrano testifying as a witness. It *does* mention Serrano's conduct report, and indicate that the report was read aloud to the plaintiff. Id. at 21. But the box next to "Testimony by reporting staff member" is not checked. Id. It is likely that what Amin was recalling in her declaration was not Serrano's live testimony, but the information he put in the written conduct report.

15

the existence of that written tip—in fact, in his brief in support of summary judgment, the plaintiff admitted that the "matter arose when an inmate sent a note to staff accusing [him] of assaulting an inmate in the unit laundry room . . . ." Dkt. No. 19 at 3. Second, the evidence shows that the plaintiff's hands were injured, which supports a conclusion that he was involved in a fight. Contemporaneous photos show bruising and cuts on both of the plaintiff's hands. Dkt. No. 27-1 at 23-24. Third, Serrano stated that he based his conduct report partly on the plaintiff's changing story: first he told a corrections officer that he injured his hand playing basketball, and later he said it was due to punching a wall. Dkt. No. 28-1 at 15. Fourth, though difficult to discern from the conduct report, it appears that Serrano relied on a sign-out sheet indicating that the plaintiff was in the vicinity of the laundry room at the time of Anderson's injury, id., and the plaintiff's own statement confirms that he was in the laundry room, id. at 21. There is no dispute that Anderson was injured in a fight in the laundry room—the plaintiff himself admitted at the hearing that he was there, and that he had a fight with another person, because that person "ran up" on him and spit on him. Id. Fifth, the plaintiff's own witness testified that Anderson was "mad" and "wouldn't let [the plaintiff] leave" the laundry room. Dkt. No. 27-1 at 8. This confirms that the plaintiff was in the laundry room and that an altercation of some kind took place. In her decision, the hearing officer indicated (by checking a box) that she had relied on his statement in reaching her conclusion. Id. These facts—particularly the

16

plaintiff's own admission that he was in a fight—constitute "some evidence" that the plaintiff was involved in an altercation.

Even accepting the facts in the light most favorable to the plaintiff, and assuming (without finding) that Serrano did not review video footage of the assault, there was sufficient other evidence to demonstrate that the plaintiff was involved in a fight.[2] Even if Serrano had lied (and the court is not finding that he did), that fact alone would not result in a violation of due process, given the other evidence presented in the conduct report and at the hearing.

> b.    Amin

For the same reasons, Amin's conclusion that the plaintiff had been involved in an assault did not violate the plaintiff's due process rights.

The plaintiff's story has changed over time. In summary judgment briefing, the plaintiff submitted an affidavit, dated over two years after the disciplinary hearing. Dkt. No. 51. In the affidavit, he asserted that he never "willing" admitted to being in a fight or altercation "ever"—he stated that he'd

---

[2] The plaintiff relies on the work order indicating that the day after the assault, the camera that would have recorded the incident had to be repaired. He assumes that the camera must not have been functioning during the assault, if it had to be repaired the next day (or if it was removed for repairs two days later, as his witness indicated). As the defendants point out, the fact that there was a request to repair the camera the day *after* the incident does not necessarily mean that it was not functioning on the day *of* the incident. Dkt. No. 24 at 13, n.2. The court need not decide this dispute, however, because it has found that there was sufficient evidence to support the hearing officer's finding without the information Serrano said he'd seen in the video review.

never been in an altercation or fight the whole time he was incarcerated. <u>Id.</u> at ¶3. He also asserted that the only testimony given at his hearing was from him and his witness, and that they explained that he "was not present . . . ." <u>Id.</u> at ¶7. In his response to the defendants' proposed findings of fact—again, filed over two years after the disciplinary hearing—the plaintiff asserted that he did not provide a written witness statement for the disciplinary hearing. Dkt. No. 53 at ¶39. He says that Amin wrote it, but that she "never fully or correctly documented" his statements, instead writing "what she wanted to further push and forge evidence of testimony because there was no video evidence at hearing." <u>Id.</u> He claims that Officer Amin also "forged" parts of his statement as well as the statement of the plaintiff's witness and was a "huge participant in the conspiracy against Wakefield." <u>Id.</u> at ¶¶41, 43.

The first time the plaintiff has claimed that he was not in the laundry room and not involved in any fight at all is at the summary judgment stage of this lawsuit, and it contradicts the record evidence. The plaintiff's bare allegation that his and his witness' statements were "forged" is not enough to defeat a motion for summary judgment. The summary of the plaintiff's statement that appears in the disciplinary hearing record begins with the statement that the charges are a "lie" and "none of that shit ever happened." Dkt. No. 28-1 at 21. While the plaintiff may be correct that Amin wrote that summary of the plaintiff's testimony, it is hard to imagine that if Amin were going to make up a statement, she would choose those words. Her summary of

the plaintiff's statements is consistent with the letter the plaintiff sent to the warden, where he argued, not that he wasn't involved in a fight, but that the other person was the aggressor: "it was my first fight in the 6 years I've been incarcerated and I wasn't even the aggressor." Dkt. No. 28-1 at 24. In that same letter, the plaintiff told the warden that staff assumed he was "in the wrong" because "I came out the victor of the altercation/fight." Id. The plaintiff also asserted that it was unfair that Anderson received fifteen days in segregation while the plaintiff received 120; he argued that he was "racially discriminated against because [Anderson] was white." Id. at 25. The plaintiff's letter to the warden didn't deny that the plaintiff was involved in the fight. It argued only that the plaintiff's punishment was not fair, given that he was not the aggressor and that he hadn't been in fights before. The letter to the warden is consistent with the written summary of the plaintiff's statements at the disciplinary hearing. It was appropriate for Amin to rely on the plaintiff's statements in reaching her conclusion.

The plaintiff also alleges, without any supporting evidence, that Amin made up his witness' statement. Again, the phrasing of that statement makes it unlikely that Amin would have made up that wording. It also makes little sense that if Amin wanted to "frame" the plaintiff, she would have made up a witness statement in which the witness said that the plaintiff was *not* the aggressor.

Finally, the plaintiff alleged in his complaint that Amin was not an unbiased hearing officer. As best the court can tell, this claim relates to his

arguments that Amin forged or made up evidence and testimony. As the court has noted, there is no support for those claims in the record. Amin did not violated the plaintiff's due process rights.

c.    McClain

McClain was the plaintiff's advocate at the hearing. The plaintiff says that McClain did not advocate for hm, did not "stop hearing," didn't prepare argument and didn't protect him from being convicted on false evidence. Dkt. No. 53 at ¶31. He also claimed in the complaint that McClain violated his due process rights by failing to obtain and preserve the video that Serrano said he'd reviewed.

As to the video, McClain declared that he'd tried to retrieve it, but it was no longer available. Dkt. No. 29 at 7. The plaintiff's argument in this regard is interesting—he insists that there was no video of the assault in the laundry room because the camera wasn't working, yet argues that McClain violated his constitutional rights by failing to obtain and preserve video footage that the plaintiff claims could not have existed. There is no dispute that when McClain tried to get the video footage, he found that it wasn't available. He cannot have violated the plaintiff's rights by failing to obtain and preserve video that wasn't available at the time he tried to obtain it.

As to the plaintiff's claims that McClain didn't adequately represent him at the hearing, even if McClain did nothing at the hearing (the record is silent as to what McClain did or did not do at the hearing), the Seventh Circuit has

20

held that when an inmate is not illiterate and the case is not so complex that the plaintiff can't collect and present the evidence himself, it does not violate due process for prison authorities to fail to appoint a lay advocate. Miller v. Duckworth, 963 F.2d 1002, 1004 (7th Cir. 1992). The plaintiff is far from illiterate, and has demonstrated that he is more than capable of collecting and presenting evidence in support of his claims. If it would not have been a due process violation for the prison staff to refuse to appoint a lay advocate for the plaintiff, any allegedly deficient performance by McClain as the plaintiff's advocate did not constitute a due process violation.

### d. Johnson

The plaintiff's claim against Johnson is that he told Johnson the other defendants had violated his rights, but that Johnson did nothing. Because the court concludes as a matter of law that no reasonable jury could find that the other defendants violated the plaintiff's constitutional rights, his claim against Johnson must fail.

### 2. *Harmless Error*

The defendants argue that even if the plaintiff's due process rights had been violated (for example, by Serrano lying about reviewing camera footage or by Serrano or McClain failing to preserve any video evidence that did exist), any such violation would be harmless because the plaintiff admitted to being in a fight. In other words, the evidence the plaintiff says was either manufactured or not disclosed would have been cumulative of the actions he had admitted.

21

For this reason, the defendants argue that the plaintiff cannot show that he was prejudiced by any procedural defects that might have occurred.

Amin found the plaintiff guilty of assault, in violation of Section DOC 303.11 of Wisconsin's administrative code. Dkt. No. 28-1 at 21. That regulation provides:

> Assault. An inmate who does any of the following is guilty of assault:
> (1) Causes bodily harm to another.
> (2) Engages in a physical altercation with another person.

Wis. Admin. Code §DOC 303.11. By his own admission, the plaintiff engaged in an "altercation with another person," or, as he put it, he "punched him while we were wrestling cuz he spit on me." Dkt. No. 28-1 at 21. Because he admitted this, the defendants are correct that any defects in the procedures regarding a video recording that may or may not have existed would be harmless error.

The plaintiff has protested that he wasn't the aggressor but was merely responding to an inmate who spat at him. Even if true, that would not constitute a defense because the assault regulation does not make an exception for provocation. The plaintiff could have been responding to a personal insult, a physical taunt, or some other kind of threat, but his guilt or innocence of the charge of assault did not turn on the underlying reason for the altercation. He was guilty of assault simply by engaging in a physical altercation. In <u>Jones v. Cross</u>, for example, the inmate admitted pushing a guard, but he claimed he did so in self-defense, "to stop him from cutting off Jones's windpipe." 637 F.3d 841, 847 (7th Cir. 2011). The Seventh Circuit

22

found that the inmate's reason was irrelevant, concluding that Jones' reason for pushing the guard did not excuse him from the charge of assault (as defined under a different federal regulation). Id. Thus, any defect in the prison's procedures was "harmless error" because the inmate's own admission that he pushed the guard sufficed to allow the hearing officer to find him guilty: "regardless of Jones's motive, he was guilty of assault because he admittedly pushed a staff member with force." Id. The same is true here. Given the plaintiff's admission that he punched Anderson, none of the evidence or procedures he now complains about would have had any impact on the finding of guilt because they were merely cumulative of the facts to which he had already admitted. In fact, as the defendants note, it appears Amin actually credited the plaintiff's version of events because she did not find him guilty of aggravated assault. If there was a procedural error here, it was harmless.

The plaintiff may have realized, belatedly, that his admission to being in an altercation could create an obstacle to his claims in this case, and so in his pleadings here has denied that he was present in the laundry room or involved in an assault. The court already has addressed those claims; they do not comport with the contemporaneous evidence.

C.    Eighth Amendment Conditions of Confinement

The plaintiff alleges that defendants Giernoth and Johnson violated the Eighth Amendment's prohibition on cruel and unusual punishment by ignoring the ant problem in the plaintiff's cell. "A prison official's 'deliberate indifference'

23

to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). For a prison official to be liable under the Eighth Amendment, two requirements must be met. First, the inmate must demonstrate that the deprivation he suffered was, objectively, "sufficiently serious." Id. at 834; see also, Williams v. Shah, 927 F.3d 476, 479–80 (7th Cir. 2019). Second, the inmate must demonstrate that the prison official had a sufficiently culpable state of mind. In a case involving prison conditions, that state of mind is deliberate indifference to inmate health or safety. Farmer, 511 U.S. at 834. The Supreme Court adopted a subjective test for defining deliberate indifference in such cases: "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

1. *Seriousness of the Deprivation*

The defendants first argue that the plaintiff cannot establish that being subject to an infestation of ants (or any insect) for a week's time rises to the level of an objectively serious deprivation implicating the Eighth Amendment. Prison conditions may be inconvenient, unpleasant, harsh and uncomfortable without violating the Eighth Amendment. Farmer, 511 U.S. at 833 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Whether the conditions at

24

issue violate the Eighth Amendment involves an analysis of the nature of the conditions and the length of time the inmate was exposed to them: "an adverse condition of confinement, if endured over a significant time, can become an Eighth Amendment violation even if it would not be impermissible if it were only a short-term problem." Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016).

In Gray, the court addressed "the infestation of vermin, insects, and birds" in the inmate's cell, noting that "[m]ice are often in Gray's cell, where they eat his food. The cell house is also infested with ants, spiders, flies, gnats, moths, and mosquitos." Id. at 1004. These conditions were essentially permanent, and the court concluded that "the myriad infestations and [the plaintiff's] lack of access to adequate cleaning supplies, taken together, deprived him of the basic human need of rudimentary sanitation in violation of the Eighth Amendment." Id. at 1005. In Antonelli v. Sheahan, 81 F.3d 1422, 1431 (7th Cir. 1996), the court found sufficiently serious the inmate's allegations of a sixteen-month infestation of cockroaches that were constantly "crawling on his body" and waking him up, causing a serious impact on his health. Similarly, in White v. Monohan, 326 Fed. App'x 385, 388, 2009 WL 1034265, at *3 (7th Cir. Apr. 17, 2009), the Seventh Circuit reversed a district court's dismissal of plaintiff's claim where the plaintiff alleged that "for over five years the 'bugs, roaches, spiders, wasps, [and] bees' had bitten and stung him

25

so often as to leave multiple scars, wounds, and sores, causing him internal injuries." Even so, the court found it a "close case." Id.

In contrast, in Sain v. Wood, 512 F.3d 886, 894 (7th Cir. 2008), the plaintiff complained of infestation by cockroaches and being bitten twice over a six-year period. The Seventh Circuit concluded that "the conditions of Mr. Sain's detention were certainly unpleasant. The state deserves no praise for permitting them to persist. However, we cannot say that, whether considered individually or collectively, they constitute a constitutional violation." Similarly, in Robinson v. Milwaukee Secure Det. Facility, the district court granted summary judgment because the injury alleged—bites from bedbugs—did not rise to the level of cruel and unusual punishment. 2016 WL 3620770, at *2 (E.D. Wis. June 29, 2016).

> At worst, she alleges she had some bites that caused itching, which was relieved by hydrocortisone cream. Individuals outside of prison are bitten by various insects thousands or millions of times per day, often resulting in skin irritation. Even luxury hotels and apartments have bedbugs, cockroaches, and other pests. Absent any allegation that the itching and bites were severe or anything out of the ordinary, an itch from insect bites does not rise to the level of harm necessary to demonstrate unconstitutional conditions of confinement.

Id.

These cases show that courts in the Seventh Circuit look for a long-term exposure to insects before finding an Eighth Amendment issue. The plaintiff here has described a single cell where he was exposed to ants for seven days. He claims to have complained to Giernoth over that week; Giernoth does not

26

remember him (or any other inmate) complaining about ants. But after his HSU visit on March 17, the HSU called and asked for the plaintiff to be transferred to another cell, and that request was granted immediately. The HSU also gave the plaintiff Bendryl and cream to treat the bites. This set of circumstances does not resemble any of the long-term, institutional pest problems described in the cases finding Eighth Amendment violations. While undoubtedly unpleasant, a single week in a cell with an ant problem is not a sufficiently serious deprivation to give rise to an Eighth Amendment violation. If five years of being bitten by spiders and roaches presents a "close case," White, 326 Fed. App'x. at 388, then a single week of ant infestation does not qualify.

The defendants also point out that the plaintiff had a towel and wash cloth in his cell, along with a sink, and had access to cleaning supplies, including a spray bottle. Dkt. No. 32 at ¶10; Dkt. No. 53 at ¶¶69-70; cf. Gray, 826 F.3d at 1005 (noting the inmate's "lack of access to adequate cleaning supplies.") He had the ability to clean up the area where he saw the ants. Finally, the medical treatment the plaintiff received was conservative—Benadryl and a topical cream—with the nurse noting indicia of scratching and several "small bite-like area[s]" scattered on the plaintiff's torso. Dkt. No. 28-2 at 16. On the wide spectrum of prison conditions, these injuries are more suggestive of a nuisance and annoyance than the kind of severe conditions that implicate the Eighth Amendment.

27

## 2. *Defendants' Knowledge of Conditions*

The defendants also argue that even if being exposed to ants for a week was sufficiently serious to trigger the Eighth Amendment, there is no evidence that either Giernoth or Johnson possessed the requisite mental state to support a finding of deliberate indifference. The plaintiff has alleged that he wrote to the defendants about the conditions in his cell, and his cellmate indicates that the plaintiff wrote to "all staff" about the problem. Dkt. No. 20-1 at 31. The defendants don't recall any complaints, and the plaintiff does not allege that he filed any formal grievances or complaints until after he was transferred. In some kinds of cases, a litigant's statement that he wrote letters to the defendants would suffice to create a genuine issue of material fact; certainly an *allegation* that he did so would be enough to survive a motion to dismiss at the pleadings stage. Baker v. Edwards, 2001 WL 103435, at *3 (N.D. Ill. Jan. 31, 2001) ("Plaintiff alleged that he submitted 30 medical request forms and filed 11 grievances, and this is certainly enough.") The court concludes, however, that at the summary judgment stage, the plaintiff's bare statement that he wrote to the defendants, supported by his cellmate's vague testimony that the plaintiff wrote to "all staff" about the ants, is not sufficient to create a genuine issue of material fact. Dkt. No. 20-1 at 31.

In Vance v. Peters, 97 F.3d 987, 994 (7th Cir. 1996), the plaintiff alleged that she and other inmates had written to the warden about her broken arm. The court granted summary judgment in favor of the warden because the

28

plaintiff had provided no copies of any letters, nor "any detail to permit the conclusion that the letter sufficiently advised the warden of the situation to require her intervention." Id. "There is no corroborative evidence with respect to the letters that Ms. Vance says that she sent to the defendant officials. She had no copy of a letter and no letter was produced from any other source." Id. The court concluded that "[u]nder these circumstances, we cannot say that there is sufficient evidence to permit a jury to determine that the warden was sufficiently alerted of a lapse in Ms. Vance's treatment as to require her intervention or further investigation." Id.

Similarly, in Daugherty v. Page, 906 F.3d 606, 611 (7th Cir. 2018), the court found summary judgment appropriate on the question of the defendants' knowledge because although the defendant prison guards "may have made rounds through the prison and talked to inmates about their complaints, there is no evidence that either of them was specifically aware of the particular conditions forming the basis of Daugherty's Eighth Amendment claim."

The plaintiff was a frequent user of the prison grievance process, and he has not explained why he would have written letters rather than used the inmate grievance process (with which he was familiar) to make the defendants aware of the problem. The plaintiff has not provided the court with copies of letters or other communications, which puts the court in the Vance scenario where "no corroborative evidence" supports the plaintiff's claim that he had written to the defendants. Vance, 97 F.3d at 994.

The court concedes that whether the plaintiff sent letters is a question of fact. But there is also the question of *what* he might have communicated in those letters. Both Vance and Daugherty note that to show deliberate indifference, a plaintiff not only must alert a defendant to a general problem ("there are ants in my cell and I want to move"), but to the "particular conditions" that might make up an Eighth Amendment claim. Daugherty, 906 F.3d at 611. If the condition is obviously grave—an inmate has suffered a heart attack, for example—the details about the communication do not matter much. It is enough that the officer is told an inmate has had a heart attack. But just telling a prison staff member that there are ants in a cell woud not necessarily indicate an immediately serious condition of confinement. The inmate might simply be complaining that he doesn't like ants or bugs, or that he is concerned that his cell is not clean. That might cause the prison official to schedule an exterminator for the following month. Unless the inmate says that the ants are biting me all the time and I can't sleep and I'm scratching myself bloody, the staff member may have no reason to think that there is a risk of immediate harm.

The plaintiff has provided no detail regarding what he might have written in his letters. In the grievance he filed following his transfer, the plaintiff stated that he "wrote" Cpt. Giernoth, among many other staff members, although the grievance does not say what he wrote, or when. Dkt. No. 28-2 at 11. Even now, in his summary judgment affidavit, the plaintiff states that he contacted

30

Giernoth and Johnson asking to be moved and complaining about "the ant and other bug infestations." Dkt. No. 51 at ¶30. Without any description of what he actually wrote, and when he wrote it, it would be impossible for a jury to conclude that either defendant knew any more than that there were bugs in the plaintiff's cell. "Summary judgment is not a time to be coy: '[c]onclusory statements not grounded in specific facts' are not enough." <u>Daugherty</u>, 906 F.3d at 611 (citations omitted). The court finds that no reasonable jury could conclude that either defendant knew of an objectively serious condition but was deliberately indifferent to the risk it presented.

## III. MOTION TO AMEND COMPLAINT AND FOR EXTENTION OF TIME (DKT. NO. 49)

In response to the defendants' motion for summary judgment, the plaintiff filed a motion to amend his complaint, asking to add two defendants: Warden Paul Kemper and Cindy O'Donnell, who is employed by the Office of the Secretary. Dkt. No. 49. He alleged that that these defendants conspired with defendants Serrano and Amin to "defraud and forge" evidence, namely, the report regarding the plaintiff's discipline. <u>Id.</u> at 1.

The Seventh Circuit has upheld district court denials of motions to amend the complaint late in the litigation process. In <u>Cleveland v. Porca Co.</u>, 38 F.3d 289, 297-98 (7th Cir. 1994), the court upheld a district court's refusal to allow the plaintiff to amend the complaint after discovery was completed and after the summary judgment motions had been fully briefed, noting that the motion to amend "came late in the day." In <u>Johnson v. Methodist Med. Cntr. of</u>

31

Ill., 10 F.3d 1300, 1304 (7th Cir. 1993), the court affirmed the district court's refusal to let a plaintiff amend her complaint "four years after th[e] action was commenced," saying, "[t]here must be a point at which a plaintiff makes a commitment to the theory of its case." Here, the plaintiff asked to amend his complaint twenty months after he filed the original complaint, and three weeks after the defendants filed their motion for summary judgment. Like the motion in Cleveland, the plaintiff's motion comes "late in the day."

The defendants oppose the motion, explaining that the circumstances surrounding the text that later appeared on the plaintiff's conduct report do not constitute a "forgery." As discussed above, at the highest level of the plaintiff's appeal, the Office of the Secretary directed that the conduct report be returned to the complaint examiner to flesh out the reasons for the original decision. Dkt. No. 28-1 at 10. Wiegand spoke with Amin to discuss the reasons for her decision, then he hand-wrote that explanation on top of the original disciplinary form. Dkt. No. 56 at ¶¶9, 11. He wrote, "Based on video evidence, and injuries consistent with fighting, inmate is more likely than not guilty of assault. He could not give the same reasons for his injuries." Dkt. No. 27-1 at 9. This is not "forged" evidence, and it is not a basis for the court to allow the plaintiff to amend the complaint to argue a conspiracy theory. The text was added in June, long after the plaintiff already had been released from segregation. It could not have played a role in the plaintiff's discipline and could not have deprived the plaintiff of his constitutional rights. For the same

32

reasons, any suggestion that the defendants improperly withheld this evidence is irrelevant because the plaintiff cannot show he was prejudiced either by the evidence itself or by any delay in producing it. Finally, as the court has explained, there was no underlying due process violation. The court will deny the plaintiff's motion to amend the complaint.

The court received the plaintiff's motion on March 8, 2019, twelve days before his response to the defendants' summary judgment motion was due. He asked the court to give him a short extension of time to file both that response and his reply in support of his motion for summary judgment. Dkt. No. 49 at 2-3. The court will grant that request, and deem his response to the defendants' summary judgment motion and his reply in support of his own motion timely filed.

## IV.    CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 23.

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 18.

The court **DENIES** the plaintiff's motion to amend the complaint and **GRANTS** the plaintiff's motion for an extension of time. Dkt. No. 49.

The court **ORDERS** that the case is **DISMISSED** and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 30th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**